**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **LARIEL BROWN,** )<br>)<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**TYRONE OLIVER,** *et al.*, )<br>)<br>)<br>**Defendants.** )<br>───────────────────── ) | **CIVIL ACTION NO. 5:21-cv-31 (MTT)** |

**ORDER**

In this 42 U.S.C. § 1983 action, Plaintiff Lariel Brown contends Department of

Juvenile Justice ("DJJ") employees violated his Fourteenth Amendment rights when

they failed to prevent a fellow juvenile detainee from assaulting him while he was

housed at the Macon Regional Youth Detention Center ("MRYDC").[1]  Doc. 1-1 at 19-25.

The defendants, Avery Niles, Tyrone Oliver, Ornessa Jones-Collins, Destiny David,

Marvina Jackson, Ursula Kellom, Jacinda King, June Lane, Antashia Page, Brianna

Vinson, and Shaniqua Wicker, jointly move for summary judgment on qualified immunity

---

[1] Although Brown's complaint raises claims pursuant to the Eighth and Fourteenth Amendments, Brown's response clarifies that as a pretrial detainee, his claims are properly raised under the Fourteenth Amendment.  Docs. 1-1 at 3; 29 at 2 n.1.  Brown is correct—although the Court notes "[i]n analyzing Fourteenth Amendment deliberate indifference claims, the Eleventh Circuit applies decisional law on Eighth Amendment deliberate indifference claims because the standard is the same in both contexts." *Nelson v. CorrectHealth Muscogee, LLC,* —— F. Supp. 3d ——, ——, 2022 WL 17417983, at *4 n.4 (M.D. Ga. Dec. 5, 2022) (citing *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014)).

grounds.[2]  Doc. 23.  For the reasons discussed below, the defendants' motion (Doc. 23) is **GRANTED**.

## I. BACKGROUND[3]

This case arises from Brown's assault by a fellow juvenile detainee while housed at the MRYDC.  Although located in Macon, the MRYDC houses youths from "all over the state" facing criminal charges or a delinquency petition.  Docs. 23-1 ¶¶ 9-10; 29-1. When juvenile detainees first arrive at MRYDC, they are assessed by an intake specialist and classified, pursuant to DJJ policy, based on their "age, size, severity of charges, and known conflicts with other MRYDC residents."  Docs. 23-1 ¶ 11; 29-1. Based on their classification, male juvenile detainees at the MRYDC are housed in either Alpha, Bravo, or Charlie Units.  Docs. 23-1 ¶ 13; 29-1.  As Brown put it, Charlie Unit was for the "big boys," Bravo Unit was for the "medium-sized boys," and Alpha Unit was for "the small people."  Doc. 23-3 at 21:25-22:1.

Apart from classification policies, the DJJ had several safeguards in place to ensure the safety of the youths in their custody.  For example, if the intake specialist believed a different unit assignment was appropriate, they could request an override from MRYDC Facility Director Jones-Collins, although Jones-Collins testified she never

---

[2] Brown stipulates to the dismissal of Niles, the Commissioner of the DJJ when Brown was assaulted, Oliver, Niles' successor, and all fictitious "Doe" defendants.  Docs. 23-1 ¶¶ 1-2; 29 at 2; 29-1.

[3] Unless otherwise stated, all facts are undisputed.  Brown, who was at all times represented by counsel, only addressed nine of the defendants' sixty numbered facts in his response.  Docs. 23-1; 29-1.  Pursuant to Local Rule 56, those material facts asserted by the defendants, "which [Brown has] not specifically controverted by specific citation to particular parts of materials in the record," are deemed to be admitted. M.D. Ga. L.R. 56.  However, the Court has still "review[ed] the movants' citations to the record to determine if there is, indeed, no genuine issue of material fact."  *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (citation and quotation marks omitted).  Therefore, if evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Brown's favor for purposes of summary judgment.

made such an override in her tenure.  Docs. 23-1 ¶¶ 3, 12, 52; 29-1 ¶ 52; 33 at 4.  After

an initial classification determination, housing assignments were subject to periodic

review by the intake specialist and assistant director of programming to ensure

residents remained appropriately housed.  Docs. 23-1 ¶ 14; 29-1.  Additionally, if a

juvenile detainee felt unsafe in their housing assignment, they could ask to be placed in

protective custody or moved to another unit by speaking with a staff member.  Docs. 23-

1 ¶ 15; 29-1.  Juvenile detainees could also request reassignment through HELP forms,

which were available in each housing unit and could be submitted through a guard or

deposited in a box located in each unit.  Docs. 23-1 ¶ 16; 29-1.  But regardless of how a

juvenile detainee requested reassignment, that request could only be granted by Facility

Director Jones-Collins, one of two assistant directors, or the intake specialist.  Docs. 23-

1 ¶ 17; 29-1.

Brown, a Columbus native, was sixteen years old when he arrived at the MRYDC

on March 16, 2017.  Docs. 23-1 ¶ 25; 29-1.  After intake and classification, Brown was

assigned to Charlie Unit to await the disposition of numerous criminal charges, which

included "armed robbery, residential burglary, criminal street gang activity, motor vehicle

theft, and violation of the terms of his probation."  Docs. 23-1 ¶ 8; 29-1.  It is undisputed

that neither Facility Director Jones-Collins nor any other defendant was involved in the

initial classification and placement of MRYDC youths, including Brown.  Docs. 23-1 ¶¶

10, 18-19, 25, 34; 29-1.

Charlie Unit housed up to sixteen juvenile detainees, each of whom had his own

room on either the upper or lower level, with a common area known as the "dayroom,"

located on the lower level.  Docs. 23-1 ¶¶ 20-21; 29-1.  Brown, like other juvenile

detainees in Charlie Unit, was secured in his room at night, and, if he chose, could remain secured in his room during the day.  Docs. 23-1 ¶¶ 22-23; 29-1.

 To ensure the safety of Brown and other Charlie Unit residents, the DJJ required a minimum of one Juvenile Correctional Officer ("JCO") for every ten youths while not "locked down," which meant Charlie Unit had one or two JCO's during the day, and one JCO on duty at night once the juveniles were secured in their rooms.  Docs. 23-1 ¶ 24; 29-1.  Relevant here, Defendants David, King, Page, Vinson, and Wicker were all JCO's assigned to MRYDC while Brown was housed in Charlie Unit.  Docs. 23-1 ¶ 7; 29-1. They were supervised by Defendant Sergeant June Lane and Lieutenant Ursula Kellom. Docs. 23-1 ¶¶ 5-6; 29-1.  Defendant Marvina Jackson was a Support Services Worker. Docs. 23-1 ¶ 4; 29-1.

Sixteen-year-old R.F. was also housed in Charlie Unit while he awaited the resolution of a residential burglary charge.  Docs. 23-1 ¶ 33; 29-1.  In February 2017, R.F., who reportedly was nearly six feet tall and weighed 260 to 270 pounds, assaulted a JCO and was reassigned to a different DJJ facility but was "temporarily brought back to MRYDC" sometime in March to attend a court date in Macon.  Docs. 23-1 ¶¶ 34, 56; 29-1 ¶ 56; 29-6 at 25:16-18; 33 at 10.  Apart from R.F.'s February 2017 assault of a JCO—of which all MRYDC staff members were aware—R.F.'s DJJ file contained other "Special Incident Reports," the most serious of which involved R.F. slapping another youth after R.F. was kicked by that youth, a scuffle that occurred during a basketball game, the details of which are unclear, and an incident where an MRYDC staff member was injured when he applied a physical control technique to R.F. in order to gain compliance.  Docs. 23-1 ¶ 52; 29-1 ¶ 52; 29-2 at 60:6-72:7; 33 at 3-4.  Because of those

incidents and R.F.'s size, the defendants had concerns about R.F.  He was, as various defendants put it, a "troublemaker," "dangerous," and one to "keep [an] eye on."  Docs. 23-1 ¶¶ 55, 57-58; 29-1 ¶ 55, 57-58; 29-5 at 25:9-10, 31:21-32:1; 29-7 at 35:6-16, 38:6-9; 29-8 at 49:6-10, 52:23-53:8; 33 at 7-8, 13, 16-18.

When Brown arrived at MRYDC, a "beef" and "tension" existed between youths from Macon and youths from Columbus.  Docs. 23-1 ¶ 28; 29-1.  And, according to Brown, the Columbus youths were outnumbered—only Brown and two other youths in Charlie Unit were from Columbus; the remainder were from Macon.  Doc. 23-3 at 43:12-15, 44:8-19.  Sergeant Lane acknowledged the tension between Macon and Columbus youths, saying it has "always been" that way.  Docs. 23-1 ¶ 55; 29-1 ¶ 55; 29-5 at 49:4-14; 33 at 8-9.  In one instance, a Columbus youth was moved out of Charlie Unit because "he was scared that he was going to be jumped."  Docs. 23-1 ¶ 55; 29-1 ¶ 55; 29-5 at 53:4-54:6; 33 at 9.  JCO King similarly testified she was aware of the Macon-Columbus tension, and that in the week Brown arrived at MRYDC, Lieutenant Kellom instructed staff to "be more observant" due to rumors that Macon and Columbus juveniles were going to fight in the education room.  Docs. 23-1 ¶ 57; 29-1 ¶ 57; 29-7 at 21:25-23:20; 33 at 13.  JCO King also testified that she and other MRYDC staff learned through "the morning briefings" that R.F. was involved in a fight with a Columbus youth "in the gym during education" the same week Brown arrived in Charlie Unit.  Docs. 23-1 ¶ 57; 29-1 ¶ 57; 29-7 at 40:24-41:14; 33 at 14.

Despite the simmering tension between Macon and Columbus juvenile detainees, the first few days of Brown's time in Charlie Unit were relatively uneventful. When Brown first arrived, he testified "a group of boys" demanded portions of the

Columbus youths' food, although R.F. was not part of that group.  Doc. 23-3 at 42:22-43:8.  Brown was also involved in a brief scuffle, not involving R.F., during a basketball game in which he emerged uninjured, but other than that altercation—which Brown testified was unrelated to the "beef"—he did not witness or suffer any other acts of violence.  Docs. 23-1 ¶¶ 26-27, 29; 23-3 at 46:5-47:1; 29-1.

On March 24, 2017, Brown submitted a HELP request asking to be moved out of Charlie Unit because he "didn't feel comfortable in the pod."  Docs. 23-1 ¶¶ 31-32; 23-3 at 51:24-25; 29-1.  But, as Brown candidly admits, his HELP request did not give any specific reason for his requested reassignment, nor did he disclose any issues between Macon and Columbus youths in that request.  Docs. 23-1 ¶ 32; 29-1.  And while Brown gave his HELP request to a MRYDC staff member, he does not remember who that staff member was.  Docs. 23-1 ¶ 31; 29-1.  According to JCO King, Brown's help request was received by a non-party counselor, who forwarded that request to Facility Director Jones-Collins, who in turn relayed the information to JCO King and other MRYDC staff during a morning meeting, presumably the morning of March 25, 2017.  Docs. 23-1 ¶ 57; 29-1 ¶ 57; 29-7 at 49:8-50:11, 51:5-14, 52:1-2; 33 at 15.

On March 25, 2017, while the juveniles were secured in their rooms for "snack time," one of Brown's Columbus cohorts told Brown, through a vent connecting their rooms, that he heard "other boys in the Unit were going to 'jump' him," although Brown's informant did not know the identities of the potential assailants or when the attack would occur.  Docs. 23-1 ¶¶ 36, 40; 29-1.  Brown claims he relayed that threat to the JCO dispensing snacks, but he "cannot recall which guard he told, what they looked like, or what gender they were."  Docs. 23-1 ¶ 40; 29-1.  When snack time concluded, and the

boys were released from their rooms—Brown knew he could remain secured in his room if he felt unsafe but chose not to—Brown was assaulted by R.F. in Charlie Unit's dayroom. Docs. 23-1 ¶¶ 36, 41; 29-1. Brown was rendered comatose by the assault and has no memory from the moment he left his room until "[w]aking up at the hospital" several days later. Docs. 23-1 ¶ 49; 23-3 at 32:9-14, 24-25; 29-1.

At the time of the assault, JCO Wicker and JCO Vinson were on duty in Charlie Unit, and Support Services Worker Jackson was present to provide counseling-related services to other youths in Charlie Unit. Docs. 23-1 ¶ 37; 29-1. JCO King was stationed in the MRYDC control room, Sergeant Lane was on duty in another part of the facility, and JCO David was on her scheduled break. Docs. 23-1 ¶ 38; 29-1. Facility Director Jones-Collins, Lieutenant Kellom, and JCO Page were not present at the MRYDC on the day of the assault. Docs. 23-1 ¶ 39; 29-1.

JCO Wicker heard the assault begin from his position in the dayroom, and immediately turned to see R.F. and Brown scuffling. Docs. 23-1 ¶ 42; 29-1. Wicker, who initially thought the boys were "just roughhousing," ordered them to stop, and when they did not, he radioed for backup. Docs. 23-1 ¶ 42; 29-1. As Wicker approached the fray, R.F. picked up Brown and slammed him to the ground. Docs. 23-1 ¶ 43; 29-1. Wicker then attempted to forcibly separate R.F. from Brown, but R.F. evaded and continued his assault. Docs. 23-1 ¶ 43; 29-1. Support Services Worker Jackson, who was also in the dayroom when the assault began, issued verbal orders to stop and attempted to keep other youths out of the way while the JCO's intervened. Docs. 23-1 ¶ 47; 29-1. The assault lasted twenty seconds. Docs. 23-1 ¶ 45; 29-1. JCO Vinson, who was on the upper level of Charlie Unit when the assault began, arrived shortly

thereafter, and stayed near R.F. until another JCO arrived to secure him.  Docs. 23-1 ¶ 46; 29-1.  Wicker, meanwhile, rendered first aid to Brown until medical personnel arrived.  Docs. 23-1 ¶ 44; 29-1.

Sergeant Lane and JCO David also responded to Wicker's backup request while JCO King maintained her post in the control room to coordinate the emergency response.  Docs. 23-1 ¶ 48; 29-1.  Brown was taken to the MRYDC's medical unit, and then transported to the hospital by ambulance.  Docs. 23-1 ¶ 49; 29-1.  Once released from the hospital, Brown was assigned to a different DJJ facility and never returned to the MRYDC.  Docs. 23-1 ¶ 49; 29-1.  MRYDC's Facility Director Jones-Collins described R.F.'s assault on Brown as the most serious assault that occurred during her time at MRYDC.  Docs. 23-1 ¶ 52; 29-1 ¶ 52; 29-2 at 86:8-13; 33 at 4.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P.

56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving

party is not required to 'support its motion with affidavits or other similar material

*negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four*

*Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to

the district court—that there is an absence of evidence to support the nonmoving party's

case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the

movant may provide "affirmative evidence demonstrating that the nonmoving party will

be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's

showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011)

(citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if

the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed

fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to

address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court

may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).

However, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge …. The

evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

With Brown's claims against Commissioner Niles, Commissioner Oliver, and all fictitious "Doe" defendants expressly abandoned, only Brown's individual capacity failure-to-protect claims against Defendants Jones-Collins, David, Jackson, Kellom, King, Lane, Page, Vinson, and Wicker remain.[4]  Docs. 29 at 2.  As to those claims, the defendants argue they are entitled to qualified immunity.  Docs. 23-2 at 11-24; 32 at 3-10.

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic … the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority."  *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018).  "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."  *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).  Here, Brown does not argue, nor could he, that the defendants were acting outside the scope of their

---

[4] To the extent Brown's complaint can be read to assert supervisory liability claims, Brown does not respond to the defendants' argument that those claims fail; rather Brown argues that each defendant—irrespective of their supervisory status—directly participated in violating Brown's Fourteenth Amendment rights.  Docs. 1-1 ¶¶ 23-73; 23-2 at 19-21; 29 at 2-7; 32 at 8.  Any supervisory liability claims asserted in Brown's complaint are thus abandoned.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

discretionary authority.  *See Diamond v. Smith*, 2022 WL 4097333, at *3-4 (M.D. Ga. Sept. 7, 2022).  Thus, the defendants are entitled to raise the shield of qualified immunity.

To overcome a qualified immunity defense, Brown must establish that (1) the facts, viewed in his favor, establish a constitutional violation as to each defendant; and (2) the unconstitutionality of the defendants' conduct was clearly established at the time the assault occurred.  *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Brown's nine-page brief, which devotes nine paragraphs to whether a constitutional violation occurred and three paragraphs to whether each defendant had fair warning that their conduct was unconstitutional, largely considers the defendants as a group.  Doc. 29 at 2-8.  Because the Court concludes all defendants are entitled to qualified immunity, the Court, for the most part, follows Brown's approach.  However, where appropriate, the Court will note significant facts as they relate to each defendant.

**A. Brown Cannot Show Any Defendant Violated His Constitutional Rights**

Jail and prison officials have a duty to protect inmates from violence at the hands of other inmates.  *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020).  But not every instance of violence between inmates "translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Rather, it is only "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the [Fourteenth] Amendment."  *Id.* at 828.  Thus, to survive summary judgment, there must be evidence of: (1) a substantial

risk of serious harm; (2) deliberate indifference to that risk; and (3) causation. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013).  Brown does not contend that a different constitutional standard applies to juvenile detainees.

*1. Brown Cannot Show a Substantial Risk of Serious Harm*

"The first element of a [Fourteenth] Amendment claim—a substantial risk of serious harm—is assessed under an objective standard." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016) (internal citation omitted).  To prevail, Brown must show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Lane*, 835 F.3d at 1307).  Brown can make this showing by demonstrating a "general threat" to all juvenile detainees based on dangerous conditions in Charlie Unit, or by an individualized risk based on a "specific threat" to Brown.  *Id.* at 1233, 1235. While it is difficult to discern from Brown's two paragraph discussion, which fails to cite *any* legal authority, Brown appears to contend that because he was a Columbus native, the Macon youth in Charlie unit posed a generalized threat to Brown due to the "simmering tension" between the groups.  *See* Doc. 29 at 3-4.  In other words, Brown was at risk not because R.F. or anyone else posed a threat specific to Brown, but because Brown was one of the Charlie Unit youths from Columbus.

The burden to establish a substantial risk of serious harm because of a generalized threat is a heavy one—"[t]o establish deliberate indifference based on a generalized risk, the plaintiff must show 'that serious inmate-on-inmate violence was the norm or something close to it.'" *Marbury*, 936 F.3d at 1234 (quoting *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga*, 400 F.3d 1313, 1322 (11th Cir. 2005)).  In *Marbury*, the

Eleventh Circuit rejected the contention that Marbury, an inmate who was "was stabbed and hit in the face in the prison's dayroom," faced a "generalized risk of attack" based on "his statement that he personally witnessed *fifteen inmate-on-inmate stabbings* during his time at [the prison]."  *Id.* at 1232, 34 (emphasis added).  The Eleventh Circuit reasoned that because "the fifteen stabbings may have occurred over the course of 6 years, for a rate of 2.5 per year," and nothing else in the record placed "Marbury's statement in context," such as "the total prison population or the sections of the prison in which the attacks occurred," he failed to present sufficient evidence "regarding a general risk of inmate-on-inmate violence" to survive summary judgment.  *Id.* at 1234-35.  Because Marbury only presented evidence "that inmates … faced some risk of assaults by fellow prisoners," not "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm," his failure-to-protect claim failed.  *Id.* at 1235.

Here, the "simmering tension" in Charlie Unit because of the Macon-Columbus rivalry does not at all suggest an environment "beset by violence."  The record reveals only one confrontation—a minor scuffle between R.F. and a Columbus youth in the gym—and a transfer request by a Columbus youth because he was "scared."  Docs. 23-1 ¶¶ 55, 57; 29-1 ¶¶ 55, 57; 29-5 at 53:4-54:6; 29-7 at 40:24-41:14; 33 at 9, 14.  Even in the context of the acknowledged general rivalry, those two events do not show that Charlie Unit was so "beset by violence" that Columbus youths faced a "substantial risk of *serious* harm" merely because they were housed with Macon youths.  *See Marbury*, 936 F.3d at 1235 (emphasis added).  Nor can it be said that R.F.'s presence in Charlie Unit created an environment "beset by violence."  The defendants were rightfully

concerned about R.F. based on his DJJ file, and specifically his prior assault on a JCO, but no Charlie Unit youth was ever assaulted with such severity that they required hospitalization until R.F.'s assault on Brown—MRYDC's Facility Director Jones-Collins described R.F.'s assault on Brown as the most serious assault that occurred during her time at MRYDC.  Docs. 23-1 ¶ 52; 29-1 ¶ 52; 29-2 at 60:6-72:7, 86:8-13; 33 at 3-4.  In short, the past instances of conflict between Macon and Columbus youth were not objectively serious, and even if they were, the incidents driven by the rivalry and R.F.'s assault on a JCO were too infrequent to make Charlie Unit "beset by violence." *Marbury*, 936 F.3d at 1235.

Even in the absence of a generalized risk, a plaintiff may be able to demonstrate that a specific threat poses a substantial risk of serious harm.  *Id.* at 1233, 1235.  Had Brown argued R.F. posed a threat of harm specific to him, that argument would also fail. As *Marbury* makes clear, "officials must possess enough details about a threat to enable them to conclude that it presents a 'strong likelihood' of injury, not a 'mere possibility.'"  936 F.3d at 1236.  Applying that principle, the Eleventh Circuit held "Marbury's statement that he had heard from a friend that an unnamed prisoner intended to hurt him, and that he was afraid of being hurt or killed, without any further details," was insufficient "to make the defendants aware of a substantial risk of serious harm."  *Id.*  That "threat," the Court reasoned, was "precisely [the] type of vague statement that conveys nothing about the nature of the anticipated risk."  *Id.* at 1237. While the Court acknowledged that in some instances it "may be possible for a general threat of inmate-on-inmate violence in a prison to bolster an otherwise insufficient unspecified threat of harm," that did not hold true in *Marbury* because "Marbury ha[d]

not shown anything close to such a substantial threat from the generally violent nature of the prison environment."  *Id.*

Here, there is only evidence of two "threats" to Brown, both of which are too vague to constitute "specific threats" of serious harm.  The first, Brown's HELP request, merely stated he "didn't feel comfortable in the pod."  Docs. 23-1 ¶¶ 31-32; 23-3 at 51:9-13, 24-25; 29-1.  The second, which Brown does not rely on to demonstrate any defendants' liability, Brown's statement from one of Brown's Columbus cohorts that "other boys in the Unit were going to 'jump' him," did not disclose the identities of the potential assailants or when the attack would occur.  Docs. 23-1 ¶ 40; 29-1.  These vague statements do not evidence a substantial risk of serious harm, nor has Brown shown "anything else that would bolster the unspecified threat[s]."  *See Marbury*, 936 F.3d at 1237.

Simply stated, no reasonable jury could find Brown was exposed to a substantial risk of serious harm during his week-long stay in Charlie Unit, and for that reason the defendants are entitled to summary judgment.

*2. Brown Cannot Show Deliberate Indifference*

Brown similarly fails to carry his burden on the second element of his claim, deliberate indifference.  To establish deliberate indifference to the risk of R.F.'s assault, Brown must prove, as to each individual defendant: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."  *Goodman*, 718 F.3d at 1332 (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)).  For an actor to have subjective knowledge, he "must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference."[5]  *Farmer*, 511 U.S. at 837.

No liability arises for a defendant's "failure to alleviate a significant risk that he should

have perceived but did not," and "imputed or collective knowledge cannot serve as the

basis for a claim of deliberate indifference."  *Burnette v. Taylor*, 533 F.3d 1325, 1331

(11th Cir. 2008) (internal quotations and citations omitted).

Two cases illustrate what it takes to demonstrate deliberate indifference,

specifically with respect to a defendant's subjective awareness of a substantial risk of

serious harm.  First, in *Goodman v. Kimbrough*, the Eleventh Circuit rejected the

contention that two officers charged with supervising Goodman, a pretrial detainee,

were deliberately indifferent to the risk of serious harm posed by Goodman's cellmate,

Raspberry.  718 F.3d at 1334.  There, Goodman, who was cognitively impaired and had

symptoms of early onset dementia, was arrested and detained for loitering.  *Id.* at 1329.

Goodman's wife, upon learning of her husband's arrest, informed the jail of Goodman's

medical condition and requested her husband "be placed either in the infirmary or in

isolation so that he would not unintentionally insult another inmate and thereby come in

harm's way."  *Id.*  Goodman was subsequently placed in administrative segregation

where he shared a cell, contrary to the wishes of his wife, with Raspberry.  *Id.*  At some

point during the night Goodman was severely beaten by Raspberry.  *Id.* at 1330.

Another inmate housed in administrative segregation—but in a separate cell from

Goodman and Raspberry's—heard the fight, and "pushed the emergency call button in

---

[5] When assessing the sufficiency of specific threats to establish a constitutional violation, there is
necessarily some overlap between the "substantial risk of serious harm" element and the "deliberate
indifference" element, specifically with respect to the question of whether any given defendant had the
requisite subjective awareness to sustain a claim of deliberate indifference.  If, objectively, the threats do
not establish a substantial risk of serious harm, then the defendant to whom the threats were
communicated would not have been subjectively aware of a substantial risk of serious harm.  Still, the
elements are separate.

his cell several times … in order to notify officers that he heard a fight going on in Goodman's cell."  *Id.*  Both guards ignored the button "because they believed [that inmate] was pushing the button so that he could request free time to use the telephone." *Id.*

The Eleventh Circuit reasoned that the "subjective knowledge" of the two guards assigned to the administrative segregation unit that night "form[ed] the crux of the matter at hand."  *Id.* at 1331.  While the Court acknowledged that the guards failed to perform required cell checks, falsely reported head count, and deactivated emergency call buttons without investigating why those buttons were pressed, "[t]he failure to conduct the cell checks and head counts is negligence of the purest form; it is of no value in answering the key question here—namely, whether [the guards] knew of a substantial risk of serious harm to Goodman."  *Id.* at 1332.  While the Court acknowledged that "[t]he deactivation of the emergency call buttons is more egregious," the Court reasoned "[t]he fact that one inmate was pressing his call button does not suggest that [the guards] were subjectively aware of a risk to another inmate entirely, and it is the risk to Goodman that matters here."  *Id.* at 1333.  Because an inference cannot be based on mere supposition, "and nothing in [the] record create[d] a genuine issue of fact as to whether [the guards] were subjectively aware of a substantial risk of serious harm to Goodman," the Eleventh Circuit held the district court's grant of summary judgment was proper.  *Id.* at 1334.

Conversely, in *Caldwell v. Warden, FCI Talladega*, the Eleventh Circuit found sufficient evidence to survive summary judgment in a case where Caldwell was assaulted by his cellmate, Pinson.  748 F.3d 1090, 1102 (11th Cir. 2014).  Pinson, who

was apparently unhappy with having Caldwell as a cellmate, started a fire in the locked

cell he shared with Caldwell, using Caldwell's personal effects as kindling.  *Id.* at 1093-

94.  Once Caldwell and his cellmate assailant were removed from the fiery cell—the fire

caused the cell to fill "with flames and black smoke"—Caldwell was examined by

medical and subsequently stated to the defendants that he feared Pinson would kill him

should he return to his cell.  *Id.* at 1094.  Nonetheless, Caldwell was returned to his cell

without any investigation as to what provoked Pinson's fire, or "whether Pinson could

readily endanger Caldwell's life a second time."  *Id.* at 1095.  While Caldwell was

reading a book the next day, Pinson "placed Caldwell in a chokehold until Caldwell

passed out."  *Id.*  When Caldwell woke up, "his hands and feet were bound with fabric,"

and Pinson, armed with a shank, was yelling "through the cell door that he was going to

kill Caldwell."  *Id.*  Hostage negotiations ensued, and Caldwell was eventually released

after a ninety-minute standoff with prison officials.  *Id.*

The Court held these facts sufficiently demonstrated subjective knowledge.  *Id.* at

1101.  Rejecting the defendants' argument that "the defendants did not have notice that

inmate Pinson would try to harm Caldwell specifically" because "the cell fire was just as

likely to harm inmate Pinson as plaintiff Caldwell," the Eleventh Circuit reasoned that a

reasonable inference to be drawn "from the fact that inmate Pinson intentionally burned

Caldwell's personal effects in the fire," was that Pinson wished to harm Caldwell—the

fact that the fire also put Pinson's life in danger was immaterial.  *Id.* at 1101.  Combined

with "Pinson's history of violence," and Caldwell's well-grounded statements that he

"feared … for his life if he was locked back in a locked cell with inmate Pinson," the

Eleventh Circuit held a jury could "infer that the defendants actually knew that Caldwell

faced a substantial risk of serious harm if he was returned to a cell with inmate Pinson." *Id.* In other words, the facts demonstrated the defendants' knowledge of a threat posed to Caldwell specifically by Pinson. *Id.*

To establish subjective knowledge of a serious risk and the disregard of that risk, Brown cites the defendants' knowledge of R.F.'s propensity for violence, Brown's HELP request, R.F's fight with a Columbus youth in the week prior to Brown's assault, and the transfer of a different Columbus youth from Charlie Unit in the days prior to Brown's assault. Doc. 29 at 4-7. It is understandable that Brown makes no mention of the vague warning he received during snack time—there is no evidence that any defendant was aware of the warning. Nevertheless, the Court considers that as well. First, Brown's HELP request, which asked to be transferred because he "didn't feel comfortable in the pod," cannot establish subjective knowledge because it did not explain why he wanted to leave Charlie Unit—it only requested that he be moved.[6] Docs. 23-1 ¶¶ 31-32; 23-3 at 51:9-13, 24-25; 29-1; *see Caldwell*, 748 F.3d at 1101. Even if Brown's HELP request articulated something more, the failure to process that March 24 request before the March 25 assault, like the guards' failure to conduct cell checks and head counts in *Goodman*, was at worst negligent.[7] 718 F.3d at 1332. And the fact that at least some of the defendants knew of R.F.'s reputation and the tension between Columbus and Macon youths, such that R.F. fought a Columbus youth in the

---

[6] In his brief, Brown argues he "submitted a timely 'help request' to be moved away from R.F." Doc. 29 at 5. But as Brown admitted during his deposition, his HELP request did not cite any specific reason why he wanted to be moved, and it certainly made no mention of R.F. Docs. 23-1 ¶¶ 31-32; 23-3 at 51:7-52:4; 29-1.

[7] Since this case was briefed, the Eleventh Circuit clarified that to prevail on a deliberate indifference claim, a plaintiff must establish that the defendant "acted with 'more than *gross* negligence.'" *Wade v. McDade*, 67 F.4th 1363, 1366 (11th Cir. 2023) (emphasis in the original).

week prior to Brown's assault and a different Columbus youth was removed from Charlie Unit in the days prior to Brown's assault is similarly insufficient—"it is the risk to [Brown] that matters here." *Id.* at 1333.

The closest Brown can get to showing subjective knowledge of *any* risk of harm to him is Brown's statement to someone unknown that he had heard "other boys in the Unit were going to 'jump' him." Docs. 23-1 ¶¶ 36, 40; 29-1. Even if Brown could show and had argued that a defendant was aware of his statement, knowledge of that vague, secondhand report does not rise to the level of subjective knowledge that Brown was at risk when he left his room after snack time. *See Caldwell*, 748 F.3d at 1101. And if the threat did not lead Brown to elect to stay in his secured room, it clearly was not sufficient to suggest to anyone else that Brown was at risk. Perhaps, in some situations, the threat of an imminent assault by an unnamed assailant could provide sufficient facts to impart subjective awareness of a threat of serious harm, but the report of a "threat" Brown relayed to someone unknown did not convey that message. In any event, any failure to act on Brown's vague report does not amount to more than gross negligence.

In summary, no defendant possessed subjective knowledge that Brown faced a risk of harm from R.F., let alone a *substantial* risk of *serious* harm required to prove a violation of his Fourteenth Amendment rights. And even if one or more of the defendants had such knowledge, there is no evidence tending to establish that any defendant acted with or failed to act with more than gross negligence. Because Brown failed to adduce colorable evidence of a substantial risk of serious harm and evidence

that would allow a reasonable jury to infer that each individual defendant was deliberately indifferent to that risk, the Court need not address causation.

## B. Brown Cannot Show an Intrusion on a "Clearly Established" Right

The discussion thus far arguably makes pointless discussion of the clearly established right prong of qualified immunity analysis.[8]   But there is a point to be made. As noted,  Brown does not argue that different cruel and unusual punishment standards apply to juvenile detainees.  Nor could he.  *See D.S. ex rel. Stinson v. Cnty. of Montgomery*, *Ala.*, 286 F. App'x 629, 633-35 (11th Cir. 2008) (applying *Farmer* and its progeny to juvenile detainee's Fourteenth Amendment failure-to-protect claim).  The single case he  cites, *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), to prove the law gave fair warning to the defendants, as a group (here again he does not distinguish the defendants by the role they played) illustrates, if anything, the absence of authority establishing that the defendants had to do more than they did.

In *Cottone*, a pretrial detainee, Cottone, was strangled to death by a mentally ill inmate, Charles, who "had been detained involuntarily under [Florida law] on numerous occasions due to his violent tendencies and a history of schizophrenia."  326 F.3d at 1355.  After Charles struck another inmate during the booking process, he was medicated and isolated for one month before a staff psychologist determined he was

---

[8] A right becomes "clearly established" in three ways.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  First, Brown can show that a materially similar case has already been decided, consisting of binding precedent by the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court.  *Id.*  Second, Brown can show that a broader clearly established principle should control the novel facts of the particular case—that is, the unconstitutionality of the instant conduct must be apparent by looking to the guiding principles of the previous case, irrespective of the underlying factual situation.  *Id.*  Third, Brown can show that the conduct is so egregiously unconstitutional that prior case law is unnecessary.  *Id.*  The second and third methods are rarely successful—"[t]he nonexistence of a decision specifically addressing the alleged right is a significant consideration in determining whether the right is clearly established."  *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (citing *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987)).

mentally stable, reduced his medications, and placed him in a Unit with Cottone and another inmate. *Id.* at 1355-56. The next day, while the two guards responsible for monitoring the Unit were nowhere in sight, Charles had a "schizophrenic episode" and strangled Cottone to death with a pair of shoelaces. *Id.* at 1356. The district court held the guards were not entitled to qualified immunity and the Eleventh Circuit agreed. *Id.* at 1357. The Eleventh Circuit reasoned that because the guards "took consecutive breaks and watched video games" rather than carry out their assigned duties of "supervis[ing] Charles as one of the mentally ill inmates in Unit 1," qualified immunity was properly denied. *Id.* at 1360. In other words, because Cottone's estate plausibly alleged "there was no supervision of … a known violent inmate who posed a substantial risk of serious harm to the other inmates," and prior case law "gave fair and clear warning" that "total failure to monitor a known violent inmate … constitutes unconstitutional deliberate indifference to Cottone's Fourteenth Amendment rights," the guards' claim to qualified immunity failed. *Id.*

*Cottone* is simply inapposite to the facts of this case. First, *Cottone*, and the cases on which *Cottone* relied, turned on a "total failure to monitor a known violent inmate." 326 F.3d at 1359-60 (discussing *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) and *Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995)). Here, there was at least some effort to monitor R.F., e.g., he was discussed at MRYDC staff meetings and morning briefings and, as various defendants testified, he did receive particular attention. Moreover, R.F., who assaulted a JCO and fought another youth, is in no way comparable to the unmedicated schizophrenic inmate in *Cottone* with a lengthy history of violent outbursts and involuntary commitment.

Second, *Cottone*, in substantial part, involved the officers' total failure to respond once the assault began.  Brown does not, and could not, argue than any defendant did not respond appropriately to Brown's assault.  On the day of the assault, JCO Wicker and JCO Vinson were on duty in Charlie Unit, and Support Services Worker Jackson was present to provide counseling-related services to other youths in Charlie Unit. Docs. 23-1 ¶ 37; 29-1.  There is no contention that Wicker, Vinson, or Jackson abdicated their duties in any form or fashion.  Wicker immediately intervened when he heard the assault begin, Vinson timely responded to Wicker's call for backup, and Jackson did the best she could to assist despite not having the training to intervene. Docs. 23-1 ¶¶ 42-43, 46-47; 29-1.  JCO King monitored the situation from her assigned position in the MRYDC control room, and both Sergeant Lane and JCO David responded to Wicker's backup request even though they were not in Charlie Unit at the time the assault occurred.  Docs. 23-1 ¶¶ 38, 48; 29-1.  Facility Director Collins, JCO Page, and Lieutenant Kellom were not present at MRYDC on the day of the assault. Docs. 23-1 ¶ 39; 29-1

In short, the facts in *Cottone* bear little similarity to the facts here.  Further, Brown makes no effort to demonstrate that each defendant's conduct, as opposed to the totality of all conduct, violated clearly established law, and thus has not carried his burden to show that the defendants are not entitled to qualified immunity.  Brown's best argument, which he does not make, is that juvenile detainees are not adult inmates and different standards should apply.  It would not be unreasonable to argue that corrections officers should owe a heightened duty of care to juveniles in their custody.  But that argument makes the ultimate point.  There is no law, clearly established or otherwise,

that gives notice to juvenile corrections officers, counselors, intake specialists or their supervisors that their constitutional duties differ from the duties owed adult inmates. Perhaps there should be, but there isn't.

## IV. CONCLUSION

The conduct of each individual defendant here falls well short of violating Brown's Fourteenth Amendment rights.  But even if there was some colorable constitutional violation, the unconstitutionality of the defendants' conduct was not "clearly established" at the time the conduct occurred.  Accordingly, the defendants' motion for summary judgment on qualified immunity grounds (Doc. 23) is **GRANTED**.

**SO ORDERED**, this 3rd day of August, 2023.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT